NURSING HOME CONSULTANTS,
INC., Plaintiff

v.

QUANTUM HEALTH SERVICES, INC.;
Pennsylvania Health Care Marketing,
Inc.; Armstrong Health Care, Inc.; Continental Health Care, Inc.; Global
Healthcare, Inc.; and Wendell Davis,
Defendants

ARMSTRONG HEALTH CARE,
INC., Counterclaimant

v.

NURSING HOME CONSULTANTS,
INC., Counterclaim Defendant.

Wendell DAVIS, Third–Party Plaintiff

v.

Samuel LAMEY, Third–Party Defendant.

ARMSTRONG HEALTH CARE, INC.,
Fourth–Party Plaintiff

v.

Samuel LAMEY, Fourth–
Party Defendant.

QUANTUM HEALTH SERVICES,
INC., Plaintiff

v.

Samuel LAMEY; Jerry Berry; National
Claims Management; Nursing Home
Consultants, Inc.; Creative Environment, Inc.; Physicians Business Systems, Inc.; and Jeral Howard, Defendants.

Samuel LAMEY and Jerry Berry,
Counterclaimants

v.

Wendell DAVIS; Bobby Hargis; Pennsylvania Health Care Marketing, Inc.;
Armstrong Health Care, Inc.; Continental Health Care, Inc.; and Global
Healthcare, Inc., Third–Party Counterclaim Defendants.

Bobby HARGIS, Fourth–Party
Counterclaimant

v.

Samuel LAMEY; Jerry Berry; Nursing
Home Consultants, Inc.; Creative Environment, Inc.; Physician Business Systems, Inc.; and Jeral Howard, Fourth–
Party Counterclaim Defendants.

ARMSTRONG HEALTH CARE, INC.,
Fifth–Party Counterclaimant

v.

Samuel LAMEY and Jerry Berry, Fifth
Party Counterclaim Defendants.

ARMSTRONG HEALTH CARE,
INC., Fifth–Party Plaintiff

v.

NURSING HOME CONSULTANTS,
INC. and Jeral Howard, Fifth–
Party Defendants.

Civil Nos. LR–C–94–22, LR–C–94–325.

United States District Court,
E.D. Arkansas,
Western Division.

May 20, 1996.

W.H. Dillahunty, Dillahunty Law Firm, Little Rock, AR, and Peter G. Kumpe, Williams & Anderson, Little Rock, AR, for Nursing Home Consultants, Inc.

Jeffrey Hines Moore, Friday, Eldredge & Clark, Little Rock, AR, and David R. Johnson, William James Rogers, Thomson, Rhodes & Cowie, P.C., Pittsburgh, PA, for Quantum Health Services, Inc.

David R. Johnson, Thompson, Rhodes & Cowie, P.C., Pittsburgh, PA, for Wendell Davis, Armstrong Health Care, Inc., Global Healthcare, Inc., Continental Health Care, Inc., Pennsylvania Health Care Marketing, Inc., Bobby Hargis, and Health Care Network, Inc.

Peter G. Kumpe, Williams & Anderson, Little Rock, AR, for Samuel Lamey and Jerry Berry.

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

EISELE, District Judge.

Before the Court is the Motion for Summary Judgment, filed, pursuant to Rule 56 of the Federal Rules of Civil Procedure, by Wendell Davis, Bobby Hargis, Quantum Health Services, Inc. (Quantum), Pennsylvania Health Care Management, Inc. (PHCMI), Armstrong Health Care, Inc. (Armstrong), Continental Health Care, Inc. (Continental), and Global Health Care, Inc. (Global) (collectively "the Movants"), in connection with the claims asserted by Nursing Home Consultants, Inc. (NHC) in the above-captioned action.[1] NHC has responded to this motion, opposing the relief sought. In support of their motion, the Movants have raised a number of legal arguments; however, after carefully considering the parties' submissions, the Court has become convinced that it need only consider one of those arguments, as the Court is of the opinion that the first of the Movants' arguments is dispositive of this matter.[2] As indicated during the on-the-record telephone conference held on May 10, 1996, the Court has concluded that the contract from which this litigation stems is illegal, and hence unenforceable, and that, under the facts of this case, no claim for damages can be predicated upon this contractual relationship, including NHC's claim for fraud, as presently alleged. After considering the arguments raised in NHC's most recent filing (which the Court agreed to accept after its May 10th telephone conference), and the Movants' response thereto (which was received by fax on May 16, 1996), the views expressed by the Court during the May 10th telephone conference are hereby reaffirmed, adopted in full, and incorporated by reference herein. Accordingly, the Movants' motion for summary judgment will be granted.[3] The Court files this written opinion to ex-

1. These claims are set forth in the parties' jointly submitted Restatement of Claims (Docket No. 181), which was filed on November 16, 1995, at the request of the Court, in an effort to clarify the various issues raised in the numerous pleadings that had been filed up to that point. And, while NHC has recently provided the Court with a second restatement of its claims, that document has never been filed (nor was NHC granted leave to file that document. So, throughout the course of this opinion the Court will only refer to those claims set forth in the filed Restatement of Claims.

2. Accordingly, the Court expresses no opinion on the merits of the other arguments advanced by the Movants.

3. On March 1, 1996, the Movants filed a similar motion for summary judgment in connection with the claims asserted by Sam Lamey and Jerry Berry in LR–C–95–325 (Docket No. 206). However, prior to the filing of that motion, on February 9, 1996, Messrs. Lamey and Berry were alleged to have settled their claims against the Movants, and, on April 11, 1996, the Court entered an order enforcing that settlement agreement (Docket No. 237), which the Court has recently supplemented so as to provide a more detailed explanation for its decision (Docket No. 254). Thus, the above-referenced motion has been rendered moot.

plain in greater detail the reasons for its decision.

## I.

This litigation arises out of a failed business relationship between Quantum, a closely-held Pennsylvania corporation,[4] and NHC, an Arkansas corporation.[5] Many of the parties' factual allegations—most notably those concerning the corporate structure and separateness of the individual and corporate movants—are hotly disputed. However, the basic facts from which this litigation stems are largely uncontested, and the Court need only rely upon the following brief synopsis of these background facts in resolving the present motion. Indeed, the Court believes that, arguably, it could resolve this dispute on the basis of the factual allegations made by NHC in support of its complaint.[6] However, since the Movants have chosen to submit certain evidence beyond the pleadings in support of their motion, the Court will, from time to time, make reference to and rely upon that evidence, as well as that submitted by NHC.

At all times relevant to this dispute, Quantum was (and apparently still is) in the business of supplying certain medical equipment and supplies to nursing home patients,[7] for whom the cost of said equipment was subsidized by Medicare Part B.[8] Restatement of Claims, Exh. A, ¶ 13. NHC was (and apparently still is) in the business of marketing medical supplies and equipment on behalf of other companies to nursing home residents. Restatement of Claims, Exh. A, ¶ 8. In other words, NHC acted as an intermediary between nursing home residents, who were covered by Medicare, and certain medical suppliers, whose products were paid for (at least in part) by the residents' Medicare coverage.[9]

On January 25, 1993, Quantum and NHC entered into a contract (the Marketing Agreement), see Restatement of Claims,

4. In the present context, a closely held corporation is one with thirty or less shareholders. See 15 Pa.Cons.Stat.Ann. § 1103 (West Supp.1995) (defining closely-held corporations). While Pennsylvania law permits closely held corporations to be organized as statutory close corporations, see 15 Pa.Cons.Stat.Ann. §§ 2301 to 2337 (West Supp.1995), the evidence in the record (notably Quantum's stock certificates) indicates that Quantum did not avail itself of this option. See 15 Pa.Cons.Stat.Ann. § 2321(c) (West Supp. 1995) (detailing the requirements for the capital stock certificates of statutory close corporations). At the time of its incorporation in December, 1990, Quantum's 100 shares of stock ("certificated securities" as defined by 13 Pa.Cons.Stat.Ann. § 8102(a)(1) (West Supp.1995), see *Jennison v. Jennison*, 499 A.2d 302, 303–05 (Pa.Super.Ct.1985)) were held by the following individuals: Wendell Davis (50 shares); Bobby Hargis (16⅔ shares); Samuel Lamey (16⅔ shares); and Jerry Berry (16⅔ shares). Messrs. Lamey and Berry later endorsed their shares back over to Quantum in January, 1994, which event vested title in these shares in Quantum, see 13 Pa.Cons. Stat.Ann. §§ 8301(a), 8313(a)(1) (West Supp. 1995) (transfer of title takes place upon delivery of endorsed stock certificates); *Wagner v. Hart Chem. Corp.*, 597 A.2d 1208, 1213–15 (Pa.Super.Ct.1991), *appeal denied*, 533 Pa. 601, 617 A.2d 1275 (Pa.1992), irrespective of whether, as has been alleged, Quantum ever paid the agreed upon purchase price. *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 265–66 (2d Cir.1987); *Hayden Stone, Inc. v. Brode*, 508 F.2d 895, 896–97 (7th Cir.1974).

5. The details of NHC's corporate structure are not fully reflected in the record before the Court. The Court has, however, been able to ascertain that Jeral Howard now owns 100% of NHC's outstanding stock (he initially owned 50%, and the remaining 50% was later repurchased from NHC). Howard Deposition (1/10/96) at 6–7 (Docket No. 210, Exh. E).

6. Thus, the Court is left to wonder why the Movants did not raise their illegality argument in one of their previously filed motions to dismiss. Nevertheless, they did not, and so the Court will consider this issue in the context of Rule 56, rather than Rule 12(b)(6).

7. Quantum, it appears, actually functioned as a retailer, as the medical supplies which it sold were provided to Quantum by various wholesaler companies. Restatement of Claims, exh. A, ¶ 22.

8. Medicare Part B, 42 U.S.C. §§ 1395j to 1395w–4, is "a voluntary supplemental insurance program covering, generally, eighty percent of the reasonable charges for physician's services, as well as certain other medical benefits" which are not covered by Medicare Part A, 42 U.S.C. §§ 1395c to 1395i–4. *United States v. Bushman*, 862 F.2d 1327, 1329 (8th Cir.1988), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 21 (1989).

9. Since NHC did not itself supply medical supplies to nursing home residents, the relationship between NHC and the medical suppliers with whom it did business could not be described as that of retailer/wholesaler.

Exh. A, exh. A, whereby Quantum enlisted the services of NHC to broaden its sales base in a certain geographic area of the United States.[10] Under the Marketing Agreement, NHC's function was to identify Medicare recipients who needed the medical supplies that Quantum provided, and to put those recipients in contact with Quantum. Quantum would then sell its products directly to the nursing home (on behalf of the residents), and it was understood by everyone concerned that NHC had no direct involvement in the actual sales of medical supplies to nursing home residents. Restatement of Claims, Exh. A, ¶ 22. Paragraph II.C of the Marketing Agreement was very clear on this point, and Attachment C to that agreement (which detailed the sales procedures to be followed) further stated that all orders for medical supplies were to be made directly with Quantum, and that, with the exception of providing the appropriate documents, NHC was prohibited from providing any assistance to a nursing home resident in connection with his placing of an order. NHC's annual compensation under the Marketing Agreement, which was to be determined on a per-item basis (as detailed in Attachment A to the agreement), was based upon the number of units Quantum sold to those nursing home residents identified by NHC. Restatement of Claims, Exh. A, ¶ 22. In other words, the more residents NHC referred to Quantum, the more money NHC made under the Marketing Agreement. Paragraph IV.A. of the Marketing Agreement was once again very clear on this point. Under paragraph VIII, the term of the Marketing Agreement was for one year, which term would automatically renew for an additional one-year period unless either party provided timely notice of its intent to cancel the agreement. Additionally, paragraph VIII gave both parties the right to terminate the agreement on five days notice if, among other things, the other party failed to comply with "order taking procedure and service guidelines" outlined in the Marketing Agreement.

On December 17, 1993, Jeral Howard, the president of NHC, wrote to Wendell Davis, the president of Quantum, and informed him that effective December 31, 1993, NHC was terminating the Marketing Agreement. Restatement of Claims, Exh. A, exh. B. NHC based its action upon Quantum's alleged failure to follow the Marketing Agreement's "order taking procedure and service guidelines," and it is this alleged breach that serves as the basis for this lawsuit. Basically, NHC alleges that Quantum, through a rather complicated billing scheme (known in Medicare circles as the prohibited practice of "carrier shopping"), allowed a number of the sales solicited by NHC for Quantum's benefit to be filled by other companies that were allegedly owned and/or controlled by Mr. Davis (namely PHCMI, Armstrong, Continental, and Global), and that as a result Quantum artificially deflated its accounts receivable (by lowering the number of sales reflected therein). Hence, because NHC's compensation was a function of the number of items sold by Quantum (as reflected in Quantum's accounts receivable), NHC claims that Quantum caused it to receive compensation under the Marketing Agreement that was less than it was entitled to, a sum NHC states is $250,

10. Page 1 of the Marketing Agreement states that NHC was being enlisted as Quantum's marketing agent for a specific "market area," which was supposed to be defined in Attachment B to the Marketing Agreement. However, it does not appear that Attachment B (if it exists) has ever been reproduced and attached to any of the numerous copies of the Marketing Agreement in the record. Nevertheless, it appears that NHC's efforts were limited to marketing in the southwestern United States. See Restatement of Claims, Exh. A, ¶ 24.

For present purposes, it is unnecessary to describe in detail the conditions which made it economically beneficial for a nursing home residents in the southwest to purchase medical supplies from a Pennsylvania corporation. In a nutshell, it appears that in 1993, medical suppliers in certain states had a competitive advantage in providing medical supplies. At that time, the rate of Medicare reimbursement was not uniform across the United States (i.e., some geographic areas had a better rate of reimbursement than others), and, under Medicare's "point of sale" rules that were in effect in 1993, see 42 C.F.R. Parts 405, 420, 421 and 424, the rate of reimbursement was determined on the basis of where the sale was made (in this case Pennsylvania), rather than where the product was eventually used by the Medicare recipient. Restatement of Claims, Exh. A, ¶¶ 23–25.

000.00.[11]   Restatement of Claims, Exh. A, ¶¶ 26–33, 35.   NHC further claims that since Mr. Davis, Quantum, PHCMI, Armstrong, Continental and Global are, in its view, all "alter egos," each should be held liable for Quantum's breach.[12]   Restatement of Claims, Exh. A, ¶ 33.

## II.

The Court turns now to the merits of the summary judgment motion which is before it. The standards governing the Court's consideration of such a motion are well-established. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(c)).   To resist such a motion, the party bearing the burden of proof on any issue must come forward with sufficient evidence to establish that a material factual issue exists to be determined at trial.   *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, at this stage of the litigation, the Court's function is not to divine the "true" facts of the case, but only to determine whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."   *Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at 249, 106 S.Ct. at 2510.   In making this determination, the

**11.**   NHC also sought compensation for lost goodwill, but has since conceded that it has "not lost any business goodwill as a result of [its] association with the Moving Parties."   NHC Reply Brief at 4, n. 1 (Docket No. 222).

**12.**   Mr. Davis' liability for Quantum's alleged breach is predicated upon a traditional "alterego/veil piercing" theory.   However, as the Court has discussed earlier in this litigation, the movant corporations' liability is predicated upon a far more controversial theory, which the Court has referred to as "triangular piercing."   (This theory of liability can also be conceptualized under the "single business enterprise" theory of piercing the corporate veil.   *See* 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 43 (Supp.1994)).

Conceptually, a triangular pierce results from a sequential application of the traditional piercing doctrine and the "reverse piercing" doctrine—which is itself controversial in that it allows corporations to be held liable for the acts of their shareholders, *see generally McCall Stock Farms, Inc. v. United States*, 14 F.3d 1562, 1568–69 (Fed.Cir.1993) (Accepting "reverse piercing" doctrine); *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1576–77 (10th Cir.1990) (rejecting doctrine); 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.70 (perm. ed. rev. vol. 1990 & Supp. 1994)—which thereby permits two related, though independent, corporate entities (often referred to as "sister corporations"), corporations which hold no ownership interest in each other, to be held liable for the malfeasance of the other.   The linchpin of this theory of liability is that the sister corporations must have a common "parent," which is usually a third corporate entity (often referred to as the "parent corporation"), though conceptually there is no reason why this parent cannot be a common individual stockholder, especially in cases involving groups of closely held sister corporations.   *Cf. Black & White, Inc. v. Love*, 236 Ark. 529, 534–36, 367 S.W.2d 427, 431–32 (1963).   Thus, in the present case, liability under a triangular pierce would be imposed by first applying a traditional pierce to render the parent shareholder (Mr. Davis) liable for the malfeasant sister corporation (Quantum), and then applying a reverse pierce to render the innocent sister corporations (the movant corporations) liable for the parent shareholder (Mr. Davis), and, by extension, the malfeasant sister corporation (Quantum).   The triangular piercing doctrine gets its name from the following visual representation of this theory of liability:

$$P$$
$$S_2 \xleftarrow{\text{liability}} S_1$$

Earlier in the course of this litigation, the Court commented that it had serious reservations as to the viability of this "triangular piercing" theory of liability, in that it is plainly out of harmony with both the traditional piercing doctrine and the more novel "reverse piercing" doctrine.   These two doctrines are ordinarily applied to overcome the legal separateness between a corporation and *its* shareholders, *see generally* 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations §§ 41.20, 41.70 (perm. ed. rev. vol. 1990), while the "triangular piercing" theory allows for liability between corporations that are not stockholders of each other.   However, given the Court's ultimate resolution of this dispute, it is not required to pass upon this particular issue.

Court must view the evidence in the light most favorable to the nonmovant, affording that party the benefit of all reasonable inferences that can be drawn therefrom. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 364 (8th Cir.1994). If, under such a view of the evidence, it is clear that no more than a "metaphysical doubt" exists as to the material facts of the case, and that the movant is clearly entitled to judgment under those facts, then summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

### III.

The Court will first address NHC's claim for breach of contract. The Movants argue that the Marketing Agreement, upon which NHC's claim is based, is illegal, and hence unenforceable, because it violates federal Medicare law. Basically, the Movants argue that this violation results from the fact that the Marketing Agreement pegs NHC's compensation to the number of sales made by Quantum, rather than to a pre-determined annual fee. Ultimately, the Court agrees with the Movants that the Marketing Agreement violates the federal Medicare statutes and that, under the facts of this case, recovery cannot be had under a breach of contract theory. However, before discussing this matter, the Court must address a preliminary issue, namely what substantive body of law governs NHC's breach of contract claim.

### A.

Since this is a diversity action, the Court must apply the substantive law of the forum state, namely Arkansas, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including its conflict-of-laws rules. *Klaxon Co. v. Stentor Elect. Mfg.*

Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 67, 133 L.Ed.2d 28 (1995). In contract actions, the Arkansas Supreme Court has stated, in its most recent pronouncement on the subject, that it will apply the "most significant relationship" test to breach of contract claims. *Ducharme v. Ducharme*, 316 Ark. 482, 485, 872 S.W.2d 392, 394 (1994). Of course, resort to this test need only be made if the parties have not specified the law that will govern any disputes arising under their contract. As in most (if not all) other jurisdictions, Arkansas courts will enforce a contractual choice-of-law clause, provided that the law selected is reasonably related to the contract at issue and does not violate a fundamental public policy of the forum state. *See Arkansas Appliance Distributing Co. v. Tandy Elec., Inc.*, 292 Ark. 482, 485–86, 730 S.W.2d 899, 900 (1987); *Cooper v. Cherokee Village Dev. Co.*, 236 Ark. 37, 43–45, 364 S.W.2d 158, 161–62 (1963); [13] *accord Restatement (Second) of Conflict of Laws* § 187(2) (1971). Paragraph XVI of the Marketing Agreement states that the agreement "shall be governed and enforced in accordance with [the] substantive laws of the Commonwealth of Pennsylvania," and it cannot, in the Court's view, be said that the law of Pennsylvania—that which governs the agreed upon point of sale for all goods solicited under the Marketing Agreement—lacks a reasonable relationship to the parties' contractual arrangement. Nor, in the present context, does there appear to be any public policy of the State of Arkansas that would override the parties' choice of law. Accordingly, the Court will give effect to the parties' choice of law, as expressed in the Marketing Agreement, and Pennsylvania law will be applied to all questions of contract law that are relevant to this dispute.[14] And, in light of this choice-

---

13. Although these decisions arose in the context of the sale of goods governed by the Uniform Commercial Code (as enacted in Arkansas), the Eighth Circuit has indicated that this principle of Arkansas conflicts law is not so limited. *See JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 739 (8th Cir.1995).

14. While NHC has made various allegations of fraud against the Movants in connection with the execution of the Marketing Agreement, it has never alleged that the choice-of-law clause itself resulted from any such fraud. Accordingly, the Court may properly give effect to this choice-of-law clause irrespective of NHC's claims of fraud. *Restatement (Second) of Conflict of Laws* § 201 cmt. c (1971).

of-law clause, Pennsylvania law will also govern the question of what effect (if any) the Marketing Agreement's illegality has on the parties' ability to seek damages for a breach of that agreement.[15] *See Restatement (Second) of Conflict of Laws* § 202(1) (1971).

That having been said, there remains the question of what state's law governs the threshold issue raised by the Movants' defense—namely whether the Marketing Agreement is, in fact, illegal.

A distinction must here be drawn between the effect of illegality upon the validity of the contract and the illegality as such. The effect of illegality upon the validity of the contract depends upon the law selected by the application of the rules of §§ 187–188. On the other hand, whether there is any illegality will usually depend upon the local law of each state where an act related to the contract was, or is to be, done. So the local law of the state where a promise was made will usually be applied to determine the legality of its making. Similarly, the legality or illegality of performance under a contract is usually determined by the local law of the state where the performance either has taken, or is to take, place.

*Restatement (Second) of Conflict of Laws* § 202 cmt. c (1971). In light of the Marketing Agreement's choice-of-law clause, it could, perhaps, be argued that Pennsylvania law applies to this issue. *Cf. Restatement (Second) of Conflict of Laws* § 187, cmt. d (1971). However, since the illegality in this case is alleged to stem from a violation of federal law and policy, it doesn't really matter whether Pennsylvania or Arkansas law governs this issue. If the Marketing Agreement violates the law and/or policy underlying the federal Medicare system, as expressed in the Medicare statutes and reg-

ulations, it is illegal in any state in the Union.[16] *See* 15 Samuel Williston, *A Treatise on the Law of Contracts* § 1792 at 371 (Walter H.E. Jaeger, ed., 3d. ed. 1972) ("[I]f the bargain is illegal (as distinguished from merely unenforceable) where made, it is usually invalid everywhere...."). Hence, the Court need not resolve this particular conflicts problem, and may simply inquire whether the Marketing Agreement violates federal law and/or public policy. *See McBrearty v. United States Taxpayers Union*, 668 F.2d 450 (8th Cir.1982). Of course, as discussed above, the consequences of any such illegality upon the parties' rights under that agreement will be determined according to Pennsylvania law.

### B.

The Medicare statute at issue in this case is 42 U.S.C. § 1320a–7b(b)(1), which, among other things, makes it a crime to:

knowingly and willfully solicit[ ] or receive[ ] any remuneration (including [but not limited to][17] any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under [Medicare] ..., or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under [Medicare]....

As the Court stated during the May 10th telephone conference, the Marketing Agreement, by virtue of its compensation scheme, falls directly within the class of transactional

---

**15.** Without this choice-of-law clause, however, it appears, under the Arkansas Supreme Court's most recent pronouncement on the subject, that the Movants' available remedies would be determined by Arkansas law. *See Metropolitan Life Ins. Co. v. Kendall*, 225 Ark. 731, 732, 284 S.W.2d 863 (1955).

**16.** And, thus, any contrary state law or policy vis-a-vis the enforcement of this contract must yield in this case. *See* U.S. Const. Art. VI, cl. 2.

**17.** The Court has inserted this bracketed language in light of the decisions in *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995), and *United States v. Greber*, 760 F.2d 68, 71 (3d Cir.), *cert. denied*, 474 U.S. 988, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985). *See also* Officer of Inspector General, Department of Health and Human Services, *Notice of Final Rule*, 56 Fed. Reg. 35952, 35952 (1991).

relationships prohibited by § 1320a–7b(b)(1).[18] NHC was paid for referring persons who needed Medicare-covered supplies to Quantum, who in turn sold them those supplies (via their nursing homes), and this type of relationship falls squarely within the transactions prohibited by subparagraph A.[19] Alternatively, NHC could be viewed as having been paid for recommending to Medicare recipients that they purchase their Medicare-reimbursable supplies from Quantum, and as such their relationship with Quantum would violate subparagraph B. No matter how you slice it, the Marketing Agreement violates § 1320a–7b(b)(1), and accordingly the subject matter of that agreement (a referral scheme for the provision of Medicare-covered supplies) is prohibited by that statute, as is the performance of that agreement.[20]

While the Marketing Agreement plainly falls within the literal purview of § 1320a–7b(b)(1), this alone does not entail the conclusion that the agreement is illegal. Given the extremely broad scope of § 1320a–7b(b)(1), the Secretary of Health and Human Services was directed, in Pub.L. 100–93, § 14, 101 Stat. 688, 697 (1987), "to promulgate regula-

---

**18.** NHC argues that, even if the Marketing Agreement violates § 1320a–7b(b)(1), summary judgment is inappropriate because there is a material issue of fact as to whether anyone actually intended to violate this statute, *i.e.,* that there is a fact question as to the intent element of the statute. This argument is a non-starter. While it might be true that the Court, at this point, could not say that anyone is criminally liable, *see Hanlester Network v. Shalala, supra,* 51 F.3d at 1399–1401, the fact remains that the subject matter of the Marketing Agreement is contrary to the public policy of the United States, as reflected in this statute. As such, the Marketing Agreement itself is illegal, and hence unenforceable, irrespective of whether anyone can be prosecuted criminally (or civilly) in connection with that agreement. *See Modern Med. Lab., Inc. v. Smith–Kline Beecham Clinical Lab.,* 1994 WL 449281, at *4, Medicare & Medicaid Guide (CCH) ¶ 42,754 (N.D.Ill. Aug. 17, 1994).

**19.** 42 U.S.C. § 1320a–7b(b)(3)(C) provides an exemption for "any amount [of compensation] paid by a vendor of goods and services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under [Medicare]," such as skilled nursing facilities. See 42 U.S.C. § 1395x(u). However, this exemption requires that the compensation be paid pursuant to a written contract between the agent and a Medicare *provider.* 42 U.S.C. § 1320a–7b(b)(3)(C)(i). Since NHC's compensation was to be paid under a contract with a Medicare *supplier* (as opposed to a provider), the exclusion afforded by § 1320a–7b(b)(3)(C) is not applicable in this case. Likewise, since NHC was not an employee of Quantum, the exclusion afforded by 42 U.S.C. § 1320a–7b(b)(3)(B) is not applicable.

Also, the Court is aware that NHC, in its latest submission, has argued that it "did not merely act as a 'finder' and in return receive a 'finders fee' from Quantum," and that "NHC's performance under the Marketing Agreement consisted of making inventories of the nursing home medical supplies, and troubleshooting, such as returning unordered products." Statement in Opposition at 11 (Docket No. 257). This may have been so, but this fact is of no moment. NHC's compensation was based exclusively upon the number of units sold, and whether or not that compensation was strictly for sales-related activities is simply irrelevant. If NHC's compensation under the Marketing Agreement was based even in part for conduct prohibited by § 1320a–7b(b)(1), which it clearly was, that is all that is required for the agreement to violate the statute. *See United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.,* 874 F.2d 20, 30 (1st Cir.1989); *United States v. Greber, supra,* 760 F.2d at 71.

**20.** NHC attempts to avoid this result by arguing that the legislative intent underlying § 1320a–7b(b)(1) indicates that it was only intended to apply to "physicians or other persons in a position to directly influence the ordering of goods or services that are reimbursable by Medicare." NHC Reply Brief at 10. At the outset, the Court notes that NHC has not cited any legislative (as opposed to regulatory) historical materials in support of its argument. In any event, the short answer to NHC's argument is that the plain language of the statute is not so limited. *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149–50, 117 L.Ed.2d 391 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.... When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citations omitted); *see also Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992); *Hennepin County Med. Ctr. v. Shalala,* 81 F.3d 743, 747 (8th Cir.1996). Also, while a number of the reported cases do, indeed, involve prosecutions against physicians (or other direct health care providers), it does not appear that they are limited to persons who have a direct role in the provision of health care services. *See, e.g., United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., supra,* 874 F.2d at 35. And, even if the reported cases were limited to the class of persons identified by NHC, that does not change the fact that the conduct prohibited by the plain language of § 1320a–7b(b)(1) is not limited to such persons.

tions specifying payment practices that shall not be treated as a criminal offense." *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., supra,* 874 F.2d at 30. The Secretary did so, promulgating what are commonly known as the Medicare "safe·harbor" regulations, which are "entitled to the same judicial enforcement accorded Congressional legislation." *West Allis Memorial Hosp., Inc. v. Bowen,* 852 F.2d 251, 255–56 n. 4 (7th Cir.1988). The applicable regulation in effect at the time the Marketing Agreement was executed (and which is currently in effect) further confirms that the Marketing Agreement fell within the class of transactional relationships that § 1320a–7b(b)(1) sought to prohibit. 42 C.F.R. § 1001.952(d) sets forth a six-factor test to determine if contracts, such as the Marketing Agreement, fall outside the class of those prohibited by § 1320a–7b(b)(1). Section 1001.952(d) provides, among other things, that:

> As used in [42 U.S.C. § 1320a–7b(b)(1) ], "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as the following six standards are met:
>
> . . . .
>
> (5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions *and is not determined in a manner that*

*takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare . . . .*

(Emphasis added). Plainly, the Marketing Agreement fails this test, in that NHC's compensation was directly pegged to the number of sales generated on behalf of Quantum. As such, the Court must conclude that the Marketing Agreement is illegal, and hence unenforceable, in that it contemplates a business arrangement that is prohibited by § 1320a–7b(b)(1), and which is not saved by the "safe harbor" regulations. This remains true even if, as NHC claims, the Marketing Agreement only amounts to a "technical" violation of the Medicare statute.[21] *See* Officer of Inspector General, Department of Health and Human Services, *Notice of Final Rule,* 56 Fed.Reg. 35952, 35954 (1991) (refusing to incorporate into the "safe harbor" regulations any defense based upon the concepts of "substantial compliance" with, or mere "technical violations" of, § 1320a–7b(b)(1)).

## C.

NHC argues that even if the Marketing Agreement is held to be illegal, it should nevertheless be allowed a contract-based recovery under an unjust enrichment theory. Given the facts of this case, the Court is constrained to disagree.

---

**21.** Moreover, the Court notes that the regulatory history of § 1001.952(d) supports the conclusion that, while the Marketing Agreement may not properly form the basis of a criminal (or civil) prosecution, it is nevertheless illegal. *See* Officer of Inspector General, Department of Health and Human Services, *Notice of Final Rule,* 56 Fed. Reg. 35952, 35954 (1991) ("[M]any marketing and advertising activities may involve at least technical violations of the statute. We, of course, recognize that many of these . . . activities do not warrant prosecution in part because (1) they are passive in nature, i.e., the activities do not involve direct contact with program beneficiaries, or (2) the individual or entity involved in these promotions is not involved in the delivery of health care.").

Also, the Court notes that § 1001.952(d)'s regulatory history specifically contemplated that "commission sales agreements must meet the conditions of the safe harbor provisions governing personal services and management contracts." *Id.; see also* Officer of Inspector Gener-

al, Department of Health and Human Services, *Notice of Proposed Rule,* 54 Fed.Reg. 3088, 3093 (1989) ("[M]any commenters suggested that we broaden the exemption to apply to independent contractors paid on a commission basis. We have *declined to adopt* this approach. . . . We believe that if individuals and entities desire to pay a salesperson on the basis of the amount of business they generate, then to be exempt from civil or criminal prosecution, they should make these salespersons employees. . . ."). While the Marketing Agreement may not, in the purest sense, be a commission sales agreement (although the argument can be made that, since NHC received a flat fee for each item sold, it received a commission on those sales (the percentage being the fee divided by the item's total cost)), this comment, in the Court's view, provides support for the conclusion that the Marketing Agreement is illegal because it violates § 1320a–7b(b)(1) and fails to fall within the "safe harbor" regulations.

■ Basically, NHC argues that Quantum's failure to completely honor its contractual obligations allowed Quantum to enjoy the full benefit of NHC's performance without having fully paid for that performance, and that as a result Quantum (as well as the other movants) has been unjustly enriched. However, it must be remembered that this is a case where not only is the performance of the disputed contract illegal, so too is the very subject matter of the contract itself. Thus, while it may be true, accepting NHC's allegations (as the Court does for purposes of this motion), that NHC has, in fact, performed part of that bargain for which it has not yet been compensated (and could arguably have an equitable claim for compensation), the fact remains that NHC's performance was in furtherance of an illegal relationship that was contrary to federal law and policy. And, while it might seem unfair to allow Quantum to receive all the benefits of NHC's endeavors without NHC having been fully paid, the general rule is that "one who has ... performed in whole or in part illegal acts stipulated for in a bargain cannot recover the stipulated price nor even reasonable compensation for what he has done. In other words, it is entirely immaterial that the defendant in fact has benefited if the bargain is of a seriously illegal nature or is prohibited by statutes." 15 Samuel Williston, *A Treatise on the Law of Contracts* § 1787 at 353–54 (Walter H.E. Jaeger, ed., 3d. ed. 1972); *see also Restatement (Second) of Contracts* § 197, cmt a (1981).

■ This statement accords with the law of Pennsylvania, which, as discussed above, controls this particular aspect of the case. Indeed, in a case, like this one, involving a dispute arising out of a contract that violated a federal statute, the Pennsylvania Supreme Court stated:

[A]n agreement which violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void. *Pennsylvania R.R. Co. v. Cameron*, 280 Pa. 458, 466, 124 A. 638, 640,

33 A.L.R. 1281 (contract in violation of the Interstate Commerce Act, 49 U.S.C.A. § 1 *et seq.*); *Kimble v. Wilson*, 352 Pa. 275, 281, 282, 42 A.2d 526, 529 (contract violating the Public Utility Law, 66 P.S. § 1101 *et seq.*); *Kissell v. Motor Age Transit Lines*, 357 Pa. 204, 209, 53 A.2d 593, 595 (violation of the Federal Motor Carrier Act, 49 U.S.C.A. § 301 *et seq.*). Where a contract is found to be against public policy "it cannot, under any circumstances, be made the basis of a cause of action. The law when appealed to will have nothing to do with it, but will leave the parties just in the condition in which it finds them. If they have fully executed their unlawful contract, the law will not disturb them in the possession of what each has acquired under it. If one has executed in whole or in part, the law turns a deaf ear when he pleads for its aid to compel the other to do as much. * * * If the contract is still executory, the promisor is left undisturbed in the possession of the money or other property which he agreed to pay or transfer; if the contract has been executed, the promisee is left undisturbed in the possession of the money or other property which has been paid or conveyed to him." *City of Pittsburg v. Goshorn*, 230 Pa. 212, 227, 79 A. 505, 510; see also *New York & Pennsylvania Co. v. Cunard Coal Co.*, 286 Pa. 72, 81, 82, 132 A. 828, 831; 12 Am.Jur. 725, § 213.

*Dippel v. Brunozzi*, 74 A.2d 112, 114 (Pa. 1950); *see also Central Dauphin Sch. Dist. v. American Casualty Co.*, 493 Pa. 254, 426 A.2d 94, 96 (1981); *Rittenhouse v. Barclay White Inc.*, 425 Pa.Super. 501, 625 A.2d 1208, 1211 (1993); *accord Resolution Trust Corp. v. Home Savings of Am.*, 946 F.2d 93, 96–97 (8th Cir.1991); *McBrearty v. United States Taxpayers Union*, *supra*, 668 F.2d at 451 n. 2. NHC's attempts to avoid the application of this bar to equitable recovery are unavailing. NHC first argues that the Movants should be estopped from raising the illegality issue.[22] However, under Pennsylvania law

---

22. The Court notes that in paragraphs 51–53 of their answer to NHC's Restatement of Claims, see Restatement of Claims, Exh. D, which answer was filed with the consent of NHC, the Movants did affirmatively plead the defense of illegality. As such, the Court is satisfied that the requirements of Fed.R.Civ.P. 8(c) have been sat-

one cannot be estopped from raising the issue of a contract's illegality. *See American Ass'n of Meat Processors v. Casualty Reciprocal Exch.*, 527 Pa. 59, 588 A.2d 491, 495–96 (1991). And, the Court rejects NHC's claim that they should be allowed an equitable recovery because Quantum (and Davis) were more culpable, *i.e.*, because NHC was not *in pari delicto* with Quantum, in connection with the formulation of the Marketing Agreement's compensation scheme. Although this doctrine will sometimes allow a less culpable party to recover on an illegal contract, see *Peyton v. Margiotti*, 398 Pa. 86, 156 A.2d 865, 868 (1959), NHC was not within the class of persons whom the Medicare statute was designed to protect (namely, Medicare recipients and those responsible for paying those persons' health care costs), *compare Roxy Auto Co. v. Moore*, 180 Pa.Super. 603, 122 A.2d 87, 88 (1959), and thus the *in pari delicto* doctrine is applicable only if Quantum engaged in some serious "misrepresentation or oppression" directed at NHC. *Restatement (Second) of Contracts* § 198 cmt. b (1981). The Court is aware that NHC claims (and for present purposes the Court is prepared to accept as true) that Quantum misrepresented to NHC that it would not "carrier shop" in the performance of the Marketing Agreement, *i.e.*, that Quantum would not divert sales generated for its benefit by NHC to other companies (and thereby diminish NHC's bargained for compensation). However, NHC's protestations notwithstanding, there is simply no evidence to suggest that NHC was ever mislead into believing that the Marketing Agreement's compensation scheme was legal. In fact, the evidence before the Court supports just the opposite conclusion.

While it appears that, prior to the execution of the Marketing Agreement, Quantum's president, Mr. Davis, had received legal advice indicating that the agreement's per-item fee structure was likely in violation of the Medicare statute (though it is far from clear that Mr. Davis was, in fact, convinced that that opinion was correct), see Davis Deposition (8/17/94) at 52–55 (Docket No. 257, Exh. C–1), Mr. Davis did not withhold that information. NHC's president, Mr. Howard, testified during his deposition that while negotiating the terms of the Marketing Agreement, Mr. Davis told him that the Marketing Agreement's compensation scheme "may be [in] violation of [the Medicare] Safe Harbor," and accordingly Mr. Davis proposed that NHC be paid a flat fee (which would have complied with the Medicare statute). Howard Deposition (9/19/94) at 17. Mr. Howard rejected this proposal, stating "I am on a commission fee, paid one time a month from those fees, which are equivalent to 33%. *I will not accept anything else....*" [23] *Id.* (emphasis added); *see also id.* at 20. In light of Mr. Howard's deposition testimony, it is hard to fathom how NHC can argue that it and Quantum were not *in pari delicto* in connection with this aspect of their agreement.[24] On the contrary, this testimony only confirms that the principals involved in this transaction knew that their business arrangement might be illegal, but that they nevertheless decided to proceed with it. Indeed, a fair reading of this testimony suggests that Mr. Howard considered any alternative to this commission-like compensation scheme a deal breaker, even though Mr. Davis alerted him to the questionable legality

isfied, and that the illegality issue has not been waived.

**23.** In light of this testimony, the Court rejects NHC's argument that Mr. Davis' later proposal to substitute a flat fee for the Marketing Agreement's compensation scheme—which was made in a July 8, 1993 letter in an apparent effort to satisfy the "safe harbor" regulations (Docket No. 257, Exh. A), and which was rejected by NHC, Howard Affidavit ¶ 5 (Docket No. 257, Exh. B)—constituted some kind of "bait and switch."

**24.** The Court is aware that Mr. Howard has provided the Court with an affidavit in which he claims that the legality of the Marketing Agreement's compensation scheme was never discussed prior to its execution. Howard Affidavit ¶ 4. This stands in flat contradiction to his deposition testimony, and it is doubtful that this contradiction is sufficient to create a material issue of fact on this issue. See *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363–66 (8th Cir.1983). Assuming the contrary, however, the Court's disposition of NHC's *in pari delicto* argument would remain the same, and hence this evidentiary dispute cannot serve to defeat the Movants' summary judgment motion.

of that compensation scheme. Thus, the fact that Mr. Howard has disavowed any knowledge of the "safe harbor" regulations, Howard Deposition (9/19/94) at 18–19, and has stated that he has "never and still do[es] not believe that the Marketing Agreement contains an illegal compensation provision," Howard Affidavit at ¶ 9 (Docket No. 221, Exh. B), is simply irrelevant. Mr. Howard was on notice that the "safe harbor" regulations existed before the Marketing Agreement was executed, and he was thus not free to simply close his eyes to them when Mr. Davis alerted him to the possible illegality of the Marketing Agreement's compensation scheme. As such, the Court believes that each of these men voluntarily assumed the risk that their agreement might later be held to be illegal, and hence unenforceable.

So, what we have here is a business arrangement entered into by sophisticated and intelligent businessmen. Each is charged with equal knowledge of the applicable law, and each freely elected to enter into this illegal business arrangement. The overriding public interest in insuring that the prohibitions of the Medicare statute are fully enforced undercuts and diminishes whatever force there might be (if indeed there is any) to NHC's *in pari delicto* argument. *See Resolution Trust Corp. v. Home Savings of Am., supra,* 946 F.2d at 96–97. While there is some appeal to the notion that a court should endeavor to do equity between parties to certain illegal contracts (based upon the parties' relative degree of culpability), to adopt such a remedy in this case would severely undercut the deterrent effect that § 1320a–7b(b)(1) was intended to have. If people knew that, even if they had executed an agreement prohibited by the Medicare statutes, the courts would nevertheless allow them to recover the benefit of their illegal bargain, what would deter them from entering into such arrangements in the first place? This case seems to graphically illustrate that, outside the rather unlikely possibility of some criminal or civil prosecution, the answer to this question is probably nothing. Accordingly, the Court concludes, under all of the facts and circumstances of this case, that NHC cannot recover under an unjust enrichment theory from the Movants, and

that the Court should simply leave the parties as it found them. *See Modern Med. Lab., Inc. v. Smith–Kline Beecham Clinical Lab., supra,* 1994 WL 449281, at *5.

## IV.

The Court turns now to discuss, albeit somewhat more briefly, NHC's remaining claim of fraud. Ultimately, the Court concludes that the Movants are likewise entitled to summary judgment on this claim. Before explaining its reasons for that conclusion, however, the Court must first consider a preliminary matter, namely what law governs NHC's fraud claim.

## A.

■ The conflicts principle known as depecage requires a separate conflict-of-laws analysis for discrete issues in a case. *See Ewing v. St. Louis–Clayton Orthopedic Group, Inc.,* 790 F.2d 682, 686–87 (8th Cir. 1986). And, while the Court has found no Arkansas cases formally discussing depecage, the Court perceives no reason why the Arkansas Supreme Court would not adhere to this well-established doctrine. Thus, the Court is required to engage in a separate conflict-of-laws analysis as to NHC's fraud claim, since that claim sounds in tort, not contract. *See Financial Timing Publications, Inc. v. Compugraphic Corp.,* 893 F.2d 936, 943 n. 7 (8th Cir.1990).

■ In tort cases, the Arkansas Supreme Court has adopted Professor Robert Leflar's "most significant relationship" test (as distinguished from that of the *Restatement (Second) of Conflict of Laws* § 145 (1971)) for resolving conflict-of-laws issues. *Wallis v. Mrs. Smith's Pie Co.,* 261 Ark. 622, 550 S.W.2d 453 (1977); *accord Simpson v. Liberty Mut. Ins. Co.,* 28 F.3d 763, 764 (8th Cir. 1994). However, since the *prima facie* elements of a fraud claim—(1) a false misrepresentation; (2) of a material fact; (3) intentionally made with knowledge of its falsity; (4) for the purpose of securing the plaintiff's reliance thereon; (5) upon which the plaintiff did reasonably rely; and (6) which reliance proximately caused damages to the plaintiff—are the same in Arkansas and Pennsyl-

vania, *Clark v. Ridgeway,* 323 Ark. 378, 386, 914 S.W.2d 745, 749 (1996); *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 888 (1994), the Court need not resort to a formal conflicts analysis, since this case, as it pertains to NHC's fraud claim, presents a "false conflict."[25] *See Royal Indem. Co. v. Werner,* 979 F.2d 1299, 1300 (8th Cir.1992); *Wal-Mart Stores, Inc. v. Crist,* 664 F.Supp. 1242, 1262 (W.D.Ark.1987), *aff'd in part, rev'd in part,* 855 F.2d 1326 (8th Cir.1988), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). So, the Court will avoid resolving this conflicts problem, and will simply consider the law of both states in dealing with NHC's fraud claim (though, arguably, it should simply resort to the law of the forum state).[26] *See Fioretti v. Massachusetts General Life Ins. Co.,* 53 F.3d 1228, 1234 & n. 21 (11th Cir.1995) (opinion of Eisele, J.), *cert. denied,* — U.S. ——, 116 S.Ct. 708, 133 L.Ed.2d 663 (1996).

### B.

■ That having been said, the discussion of NHC's fraud claim, as pled, is a relatively simple matter. Since NHC cannot prevail on its breach of contract claim, the Court concludes that it cannot prevail on the fraud claim that it has presented. This is because that claim, as pled, is premised upon the conduct of the business operations of Quantum (and the other movant corporations), as well as the representations of Mr. Davis pertaining to Quantum's anticipated performance of the Marketing Agreement. In other words, NHC is alleging that Quantum and Mr. Davis (and the other movants) are guilty of fraud because Quantum never

intended to fully perform its obligations under the Marketing Agreement.

■ At the outset, the Court notes that because NHC's fraud claim is predicated upon alleged misrepresentations made, at the time of contracting, by Quantum (and Mr. Davis) as to Quantum's anticipated *future* performance of the Marketing Agreement, *see* Restatement of Claims ¶¶ 71(a)–(c), a serious argument can be made that NHC's fraud claim is facially deficient. As the Arkansas Supreme Court has recently explained:

> In the context of negotiating a contract, a misrepresentation sufficient to form the basis of a deceit action may be made by one prospective party to another *and must be related to a past event, or a present circumstance, but not a future event.* "An assertion limited to a future event may be a promise that imposes liability for breach of contract or a mere prediction that does not, but it is not a misrepresentation as to that event."

*South County, Inc. v. First Western Loan Co.,* 315 Ark. 722, 727–28, 871 S.W.2d 325, 327 (1994) (emphasis added) (quoting *P.A.M. Transp., Inc. v. Arkansas Blue Cross & Blue Shield,* 315 Ark. 234, 240, 868 S.W.2d 33, 36 (1993)); *accord First Natn'l Bank of Hooversville v. Sagerson,* 283 Pa. 406, 129 A. 333, 335 (1925) ("[A] breach ... of an agreement regarding the doing ... [of] something in the future is not fraud...."); *Krause v. Great Lakes Holdings, Inc.,* 387 Pa.Super. 56, 563 A.2d 1182, 1187 (1989) ("A promise to do something in the future, which promise is not kept, is not fraud."), *appeal denied,* 524 Pa. 629, 574 A.2d 70 (1990). While the Court

---

25. "A 'false conflict' exists when the potentially applicable laws do not differ...." Eugene F. Scoles & Peter Hay, *Conflict of Laws* § 2.6 at p. 17 (1984).

26. To the extent that there is any distinction between the law of these two states, the Court believes that the law of Arkansas would likely govern NHC's fraud claim. *Cf. Crellin Tech., Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 12–13 (1st Cir.1994) (applying Rhode Island's similar conflict-of-laws rule in the context of a statutory fraudulent misrepresentation claim).

   Additionally, while NHC has not pled constructive fraud (though it appears to believe such a claim is before the Court, see NHC Reply Brief at

38–39)—which would eliminate the requirement of an intentional misrepresentation, but would require a fiduciary or other "special relationship" between the parties (a showing that, on the evidence presented, likely could not be made, *see TEC Floor Corp. v. Wal–Mart Stores, Inc.,* 4 F.3d 599, 602 (8th Cir.1993); *In re Estate of Scott,* 455 Pa. 429, 316 A.2d 883, 886 (1974))—the Court notes that such a claim would be subject to the above "false conflict" analysis, as the law of Arkansas and Pennsylvania appears to be substantially similar in this context. *See Roach v. Concord Boat Co.,* 317 Ark. 474, 476, 880 S.W.2d 305, 306–07 (1994); *La Course v. Kiesel,* 366 Pa. 385, 77 A.2d 877, 880–81 (1951).

recognizes that NHC has argued that its fraud claim is not predicated upon Mr. Davis' representations concerning Quantum's future performance, NHC Reply Brief at 34, the Court believes this to be a dubious proposition given the plain language of NHC's complaint. Nevertheless, assuming NHC is wrong on this point, it is settled that where a representation of future performance is made "in bad faith and without honest intention of performing the promise," an action for fraud can be predicated upon that misrepresentation. *Starling v. Valmac Indus., Inc.*, 589 F.2d 382, 387 (8th Cir.1979); *accord Killian v. McCulloch*, 850 F.Supp. 1239, 1255 (E.D.Pa.1994); *Victor Broadcasting Co. v. Mahurin*, 236 Ark. 196, 201–02, 365 S.W.2d 265 (1963); *cf. Brentwater Homes, Inc. v. Weibley*, 471 Pa. 17, 369 A.2d 1172, 1175 (1977) ("A statement of present intention, which is false when uttered may constitute a fraudulent misrepresentation of a fact."). Having reviewed the evidence presented, the Court believes that it is at least questionable whether a reasonable jury could find that Mr. Davis acted in bad faith in making his representations to NHC as to Quantum's anticipated performance under the Marketing Agreement. Yet, the Court believes, at this stage of the game, that this question would have to be decided by a jury.

However, the Court need not rely upon the Movants' "future representation" argument in disposing of NHC's fraud claim, in that that claim suffers from a more fundamental flaw. As more fully discussed above, NHC's fraud claim is based upon its allegations that Quantum never intended to fully perform its obligations under the Marketing Agreement. A necessary predicate for that claim is that NHC was entitled to such performance. This, in essence, is the heart of NHC's claim for damages. However, as it turns out, NHC was not entitled to that performance, since the whole business undertaking with Quan-

tum was illegal. Thus, since NHC was not entitled to Quantum's performance of the Marketing Agreement (because that agreement was illegal and unenforceable), it follows that NHC will be unable to show any damages resulting from that non-performance. Hence, the facts alleged by NHC fail to state a *prima facie* case for fraud (or, for that matter, constructive fraud) under the theory alleged, since the suffering of recoverable damages is a necessary element of such a cause of action. In essence, if the Court were to allow NHC's fraud claim, as pled, to proceed, it would be indirectly permitting NHC to recover for Quantum's failure to perform an illegal contract, a result which the Court has already stated it is unwilling to sanction. Accordingly, the Court concludes that the Movants are entitled to summary judgment on NHC's claim for fraud that is now before the Court.

This is not to say, however, that there is no tenable fraud theory that could be pursued under the facts alleged by NHC. If, for example, NHC had claimed that Mr. Davis induced NHC into entering the agreement knowing that that agreement was illegal under the Medicare statute, and that he intended to reap the benefits of NHC's performance and then avoid Quantum's liability thereunder by raising an illegality defense, that would be a perfectly good fraud claim. NHC, however, has not advanced such a theory in any version of its complaint.[27] Given the requirements of Fed.R.Civ.P. 9(b), which require that a plaintiff's pleadings provide the defendant with notice of his specific theory of liability and the facts upon which it is based, *see Commercial Property Investments, Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644–46 (8th Cir.1995), there is simply no way, in the Court's view, that any of NHC's pleadings could be read as affording the Movants with sufficient notice of such a claim.[28] *Cf. Shelter Mut. Ins. Co. v. Public*

---

**27.** And, as the Court indicated during the May 10th telephone conference, it is questionable whether the facts that have been developed would now permit NHC to allege that, in 1993, Mr. Davis knew, *i.e.*, that he believed, that the Marketing Agreement was, in fact, illegal.

**28.** NHC argues, in its recently filed Statement in Opposition, that its Restatement of Claims can be

read to state such a fraud theory, because it has alleged that Mr. Davis misrepresented that "Quantum would be operated . . . in accordance with Medicare Part B and in compliance with all applicable regulations." Restatement of Claims Exh. A, ¶ 71(a). Standing alone, this blanket allegation is likely not specific enough to support any claim of fraud. *Cf. Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir.1985). The necessary

*Water Supply Dist. No. 7*, 747 F.2d 1195, 1197 (8th Cir.1984) (" '[T]here is no duty on [on the part] of the ... court to create a claim which [the plaintiff] has not spelled out in his pleading. . . .' ") (citation omitted).

## V.

IT IS THEREFORE ORDERED that the Movants' Motion for Summary Judgment[†] be, and it is hereby, GRANTED. This order resolves all claims pending or remaining in LR–C–94–22 and LR–C–94–325, and thereby serves to terminate this litigation.

specificity can be gleaned only by viewing this allegation in the overall context of NHC's Restatement of Claims. However, when read in context (as well as when viewed through the prism of this litigation's history), it is clear that this statement pertains only to Mr. Davis' alleged representation that Quantum would not engage in the prohibited practice of "carrier shopping," see Restatement of Claims ¶¶ 26–34, 70–76, and not to any alleged misrepresentation as to the legality of the Marketing Agreement's compensation provision. (What is especially telling is NHC's failure to allege that it relied upon any representation as to the legality of the compensation scheme when entering into the Marketing Agreement. *Cf. Allison v. Security Benefit Life Ins. Co.*, 980 F.2d 1213, 1216 (8th Cir.1992)). Indeed, NHC's latest argument as to the intended scope of the language of ¶ 71(a) was unheard of prior to the Court's May 10th telephone conference. It may not be raised now to avoid summary judgment.

† Docket No. 208.