**ZIMMER, INC., Plaintiff,**

v.

**NU TECH MEDICAL, INC., Defendant.**

**No. 3:97–CV–780 RM.**

United States District Court,
N.D. Indiana,
South Bend Division.

March 31, 1999.

Edward A. Sullivan, III, Baker and Daniels, South Bend, David P. Irmscher, Albert J. Dahm, Baker and Daniels, Fort Wayne, IN, for Zimmer Inc., plaintiffs.

Debra Voltz–Miller, Fred R. Hains and Associates, South Bend, IN, Bradley J. Schram, Robert P. Geller, Warren J. Perlove, Eva T. Cantarella, Hertz Schram and Saretsky, Bloomfield Hills, MI, for Nu Tech Medical Inc., defendants.

## MEMORANDUM

MILLER, District Judge.

This cause came before the court on the motion of plaintiff Zimmer, Inc. for summary judgment. Zimmer filed its complaint seeking a declaratory judgment that its agreement with defendant Nu Tech Medical, Inc. is an illegal contract that violates various federal health care statutes. In a separate order entered this date, the court grants Zimmer's summary judgment motion and denied Nu Tech's motion for oral argument on the motion. This memorandum sets forth the court's reasons for that ruling.

### I.

Zimmer is a wholly-owned subsidiary of Bristol–Myers Squibb Company and a major manufacturer of orthopedic products. Nu Tech is a Michigan corporation engaged in "the business of acting as a 'supplier' of medical items." After almost a year of discussions, representatives of Zimmer and Nu Tech executed an Independent Contractor Agreement ("the Agreement") on July 1, 1997. The Agreement recites that "Zimmer desires to engage [Nu Tech] in the distribution and billing of Zimmer products," and the par-

ties "intend that the relationship between them [to be] that of a supplier and independent contractor." The Agreement describes the course of the parties' business as follows:

Zimmer agrees to consign a reasonable quantity of Zimmer softgoods products to [Nu Tech] for the purpose of stocking the shelves of the referring physician's offices based upon the physician's annual usage requirements. [Nu Tech] agrees to bill [Nu Tech's] contracted insurance carriers for the Zimmer product[s] consigned to [Nu Tech] by Zimmer. [Nu Tech] agrees to forward the insurance carrier reimbursement and or patient payment, minus [Nu Tech's] fees for each reimbursement to Zimmer within thirty (30) days of receipt of the reimbursement from the insurance carriers and or patients.

The Fee Schedule, attached to the Agreement as Exhibit A, provides that Nu Tech "agrees to forward all reimbursements from [its] contracted insurance carriers and patients who [Nu Tech] has billed for the sale of the Zimmer softgoods products, minus the following fee:

| Dollar Volume Receivable/Year | [Nu Tech's] Fee |
| --- | --- |
| $0 to $2 Million | 25% of Receivable |
| $2.1 Million to $4 Million | 22% of Receivable |
| $4.1 Million + | 20% of Receivable |

When the receivable[s] are above the current fee schedule in a single calendar year, [Nu Tech] will reduce the fee according to the above fee schedule starting on the following month.

Section XI of the Agreement contains a provision under which Nu Tech was to provide Zimmer with "consulting services to train the Zimmer field sales force on [Nu Tech's] sales process and reimbursement issues." In exchange for a total of 100 days of consulting services, "at $1,000 per day plus travel expenses approved in advance by Zimmer," Zimmer agreed to pay Nu Tech 60% of the consulting service fees within thirty days of execution of the Agreement, with the remainder to be paid as provided in the Agreement. Section XI directs that the parties "shall agree in advance of any training the specific training requirements and outcomes to be achieved."

The Agreement's duration is two years, with the option to renew for another two years. The parties agreed that "in the event of a dispute which cannot be resolved by escalation through the management of each party, such dispute shall be submitted to binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association in Chicago, Illinois." The Agreement requires Zimmer and Nu Tech to "comply with all laws and ordinances, state, federal, and local," and that the Agreement be governed by the laws of the State of Indiana.

According to Nu Tech, after the parties executed the Agreement, representatives of Nu Tech and Zimmer met and exchanged information intended to facilitate implementation. Sometime in August 1997, Nu Tech learned that Zimmer did not want to make the $60,000 lump sum payment due under Section XI of the Agreement. Nu Tech advised Zimmer, by letter dated October 31, 1997, that it considered Zimmer's actions (or inactions) a breach of contract. Nu Tech told Zimmer that if their differences could not be resolved, Nu Tech would commence arbitration proceedings under Section VI of the Agreement.

Nu Tech maintains that only after Zimmer received the letter threatening arbitration did Zimmer inform Nu Tech that it believed that performance under the Agreement could amount to a violation of various federal health care statutes. At that time, Zimmer suggested that the parties submit a joint request for an advisory opinion as to the Agreement's legality to the Office of the Inspector General ("OIG") of the Department of Health and Human Services pursuant to 42 U.S.C. § 1320a–7d(b). Zimmer submitted its request for an advisory opinion to the OIG

on December 18, 1997; Nu Tech did not join in the request.

Two days before its submission to the OIG, Zimmer filed its declaratory judgment action pursuant to 28 U.S.C. § 2201. A preliminary injunction was entered on April 17, 1998, staying arbitration pending resolution of the validity of the contract. The summary judgment record was filed on August 17.

## II.

Zimmer sets forth three main arguments in support of summary judgment: A) the Agreement violates the anti-kickback statute, 42 U.S.C. § 1320a–7b(b); B) the Agreement violates 42 U.S.C. § 1320a–7b(b)(6), which prohibits submission of claims to federal or state health care programs that are in excess of the entity's usual charges for such items; and C) as illegal under federal law, the Agreement is void and unenforceable under Indiana law.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) "mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which the party will bear the burden of proof at trial." "Where the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

Although the moving party must initially identify the basis for its contention that no genuine issue of material fact exists, the nonmoving party cannot rest on his pleadings, but must produce his own evidence. Rule 56(e) requires that the nonmoving party who bears the burden of proof on an issue allege specific facts showing that there is a genuine issue for trial by his own affidavits or by the depositions, answers to interrogatories, and admissions on file . . . .

In considering whether there are any genuine issues of material fact we view the record and extract all reasonable inferences from the evidence in the light most favorable to the nonmoving party. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Where a fact is disputed, the nonmoving party must show that the disputed fact is material under the applicable law. The applicable law will dictate which facts are material. Only disputes that could affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*National Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264–265 (7th Cir.1996) (citations omitted). Nu Tech moved for oral argument, but the parties' briefs adequately explain their positions, and to schedule argument at this point would only further delay ruling in this case. For that reason, the separate order denies the motion for oral argument.

## III.

As enacted in 1972, the Medicare–Medicaid Anti–Kickback statutes made it a misdemeanor to solicit, offer, or receive "any kickback or bribe in connection with" furnishing covered goods or services or referring a patient to a provider of those services. *See* Social Security Amendments Act, Pub.L. No. 92–603, §§ 242(b) and 242(c), 86 Stat. 1419 (1972). Congress expanded the language in 1977 to prohibit the solicitation or receipt of "any remuneration (including any kickback, bribe, or

rebate)" in return for referrals, to prohibit the offer or payment of such remuneration to induce referrals, and to make violations of the statutes a felony. *See* Medicare–Medicaid Antifraud and Abuse Amendments, Pub.L. No. 95–142, 91 Stat. 1175, 1181, 1182 (1977). In 1980, the knowing and willful requirement was added, Omnibus Reconciliation Act of 1980, Pub.L. No. 96–499, 94 Stat. 2599, 2625 (1981), and in 1987, the Medicare and Medicaid statutes were combined into one statute (42 U.S.C. § 1320a–7b) and the Office of the Inspector General was authorized to exclude individuals and entities that violated the statutes from the Medicare and Medicaid programs. *See* Medicare and Medicaid Patient and Program Protection Act of 1987, Pub.L. No. 100–93, 101 Stat. 680, 681–682 (1989). None of the amendments since then affect the statute in any significant way for purposes of this discussion.

The relevant section of the current Anti-Kickback Statute, 42 U.S.C. § 1320a–7b(b), provides as follows:

**(b) Illegal remunerations**

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in case or in kind—

\* \* \* \* \* \*

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than 5 years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly,

in cash or in kind to any person to induce such person—

\* \* \* \* \* \*

(B) to purchase, lease, order, or arrange for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than 5 years, or both.

Any person or entity that commits an act described in paragraph (1) or (2) of section 1320a–7b(b) is subject, in addition to any other penalties prescribed by law, to a civil money penalty of not more than $50,000 for each such act, and is subject to an assessment of damages. 42 U.S.C. § 1320a–7a. In addition, the Secretary may exclude the person or entity from participation in federal health care programs and may direct appropriate state agencies to exclude the person or entity from participation in state health care programs as well. 42 U.S.C. § 1320a–7a(a); *see also* 42 U.S.C. § 1320a–7(a) and (b).

## IV.

Zimmer maintains that the Agreement violates 42 U.S.C. § 1320a–7b(b). Nu Tech was to receive a percentage payment under the Agreement's consignment arrangement for marketing and distributing Zimmer's products. The percentage and amount of payment were to be based on the volume of Zimmer products sold. Because Medicare and Medicaid would pay for some of those products, the payments to Nu Tech would, Zimmer argues, amount to illegal remuneration for Nu Tech's recommending or arranging for the purchase of items reimbursable under federal health care programs. Zimmer further maintains that the Agreement is not protected by the safe harbor regulations applicable to the statute.[1] Zimmer relies on the OIG's Ad-

1. The Department of Health and Human Services issued safe harbor regulations in 1991,

visory Opinion and various cases to support its position.

### A.

Pursuant to 42 U.S.C. § 1320a–7d(b), the Secretary of the Department of Health and Human Services, in consultation with the Attorney General, is authorized to issue advisory opinions on specific topics, including what constitutes prohibited remuneration under § 1320a–7b(b), and whether any activity or proposed activity could result in imposition of sanctions or exclusion from participation· in federal health care programs. *See* 42 U.S.C. § 1320a–7d(b)(2). An advisory opinion issued by the Secretary binds the Secretary and the party or parties requesting the opinion. 42 U.S.C. § 1320a–7d(b)(4)(A). A party's failure to seek or join a request for an advisory opinion may not be used as evidence to prove that the party intended to violate federal health care statutes. 42 U.S.C. § 1320a–7d(b)(4)(B).

Zimmer submitted its request for an advisory opinion to the OIG on December 18, 1997. Zimmer reports that it "sought the OIG's expert advice to determine whether the Agreement could be immunized from prosecution. However, the OIG pointedly refused to issue such an opinion. Instead ... the Advisory Opinion labeled the Agreement's use of a percentage compensation mechanism as 'problematic.'" The OIG's opinion letter, issued March 19, 1998 as Advisory Opinion 98–1, explained, "Percentage compensation arrangements are potentially abusive ... because they provide financial incentives that may encourage overutilization of items and services and may increase program costs."

With respect to the Agreement between Zimmer and Nu Tech, the OIG noted three areas of concern about the Agreement, finding that: (1) the Agreement contains significant financial incentives to both parties, increasing the risk of abusive marketing and billing practices (with specific reference to the percentage or volume-based compensation arrangement); (2) the Agreement provides opportunities for the parties to unduly influence referral sources and patients through active marketing and direct contacts with physicians and Medicare patients; and (3) the Agreement includes no safeguards against fraud and abuse, or mechanisms to guard against improper payments to physicians to induce them to order Zimmer products. The OIG concluded that those areas were sufficiently problematic to pose "an unacceptable risk of fraud and abuse so as to preclude a favorable advisory opinion." The OIG explained:

> We have adopted for purposes of this opinion Zimmer's characterization of the Arrangement as one in which Nu Tech is paid a fee for marketing and billing services. We note that there are two other plausible interpretations of the Arrangement. The Arrangement may be viewed as one in which Nu Tech pays remuneration to Zimmer in the form of a percentage of collections on Zimmer's products. Alternatively, the Arrangement could be viewed as a joint venture between Zimmer and Nu Tech. In both scenarios, amounts paid to Zimmer could be construed as payment for referrals of existing physician customers and their patients.

Zimmer notes that the advisory opinion process may only be used to immunize an agreement from prosecution. 42 C.F.R. § 1008.5(a). The OIG did not immunize the parties' Agreement. The OIG expressed concern that performance under the Agreement could subject the parties to penalties under the statute. Zimmer

---

setting forth payment practices that "shall not be treated as a criminal offense" under 42 U.S.C. § 1320a–7b(b). *See* 42 C.F.R. § 1001.952. While Nu Tech's reasoning differs from that set forth by Zimmer, Nu Tech agrees that the Agreement does not fall within

the safe harbor provisions. Because compliance with a safe harbor is not mandatory, the Agreement's failure to fit within a safe harbor does not necessarily mean that the Agreement is unlawful. *See* Advisory Opinion 98–1, at 6.

maintains that the OIG's Advisory Opinion provides persuasive authority that the Agreement is illegal.

Nu Tech takes issue with the OIG's interpretation of the Agreement. Nu Tech rejects the OIG's conclusion that because Zimmer products would be supplied to Nu Tech and subsequently to physicians on a consignment basis, the products would remain the property of Zimmer until sold to a patient. Nu Tech claims that because consignment relationships are subject to the laws of the various states, the OIG's conclusion about the title of the Zimmer products was "grossly misleading," not supported by any legal authority, and "careless at best." Nu Tech maintains that the OIG erroneously characterized the Agreement as an arrangement under which Nu Tech would be paid for marketing and billing services. Nu Tech additionally asserts that the OIG "conspicuously ignored the question of whether the amounts to be received and retained by Nu Tech would constitute a supplier's legitimate net sales revenue."

Nu Tech also argues that Zimmer's reliance on and citation to Advisory Opinion 98–1 "is not only misplaced, but improper." Nu Tech claims that the information Zimmer supplied to the OIG was inaccurate, misleading, or untrue, and the opinion "does not operate as a departmental *determination* entitled to deference by this court." (emphasis in original). Nu Tech notes that it was not a party to the request for an opinion from the OIG, and pursuant to 42 U.S.C. § 1320a–7d(b)(4)(B), its failure to seek or join in such a request may not be used as evidence to prove that it intended to violate the statute.

An advisory opinion issued in accordance with 42 U.S.C. § 1320a–7d(b) is solely the opinion of the OIG, in consultation with the Department of Justice, and binds no agency other than the Department of Health and Human Services. *See* 42 C.F.R. §§ 1008.1, 1008.59. Nonetheless, courts give great deference to agency regulations and agency interpretations of those regulations. *See Bankers Life and Cas. Co. v. United States*, 142 F.3d 973, 979 (7th Cir.1998) ("[C]ourts uniformly give tremendous deference to regulations issued under a specific directive from Congress."); *Pennington v. Didrickson*, 22 F.3d 1376, 1383 (7th Cir.1994) (noting that courts have an "obligation to defer to the interpretation of the agency whenever that interpretation can be said to embody a deliberate and considered interpretation of legislative intent"). While no individual or entity other than the requestor may rely on an advisory opinion, 42 C.F.R. § 1008.53, Zimmer requested Advisory Opinion 98–1, so its introduction of and reliance on that opinion is not improper.

Nu Tech has had an opportunity to point out what it believes to be inaccuracies in the materials submitted to the OIG by Zimmer and in the opinion issued by the OIG. Nu Tech is correct that Advisory Opinion 98–1 may not be introduced into evidence to prove that Nu Tech intended to violate the anti-kickback statute, but nothing in the record suggests that Zimmer's submission of the advisory opinion in support of its summary judgment motion was so intended.

■ While Advisory Opinion 98–1 is not binding authority, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Hanson v. Espy*, 8 F.3d 469, 473 (7th Cir.1993) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Advisory Opinion 98–1, as an agency interpretation of the statute, is entitled to deference as an "informed judgment to which courts and litigants may properly resort for guidance." *Klein v. Rush–Presbyterian–St. Luke's Medical Center*, 990 F.2d 279, 285 (7th Cir.1993) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

857

The court also disagrees with Nu Tech's contentions about the shortcomings of the OIG report. Although Advisory Opinion 98–1 was based solely on the facts and information that Zimmer supplied, the Agreement was part of the information the OIG considered. Based on the Agreement's language, there was nothing unreasonable or grossly misleading about the OIG's conclusion that the Zimmer products supplied to Nu Tech under the Agreement would remain Zimmer's property until sold pursuant to the consignment arrangement. The Agreement provides in pertinent part that "Zimmer agrees to consign a reasonable quantity of Zimmer's products" to Nu Tech, Nu Tech agrees to bill insurance carriers "for the Zimmer product consigned to" Nu Tech by Zimmer, Nu Tech agrees to "audit the consigned inventory" and supply to Zimmer "a recommended consignment level order" for each new physician's office, and that Zimmer agrees to indemnify Nu Tech for any loss or claim arising out of problems with any "Zimmer products consigned to Nu Tech." Standard legal usage defines "consignment" as the "entrusting of goods to another to sell for the consignor," and defines "consign" the act of depositing of goods with another "to be sold, disposed of, or called for, whereby title does not pass until there is action of consignee indicating sale." BLACK'S LAW DICTIONARY 307 (6th ed.1990). The parties' briefs do not suggest that Indiana defines these terms any differently. The OIG's conclusion was reasonable.

Nor was it unreasonable for the OIG to conclude that the Agreement was one in which Nu Tech was to be paid for marketing and billing Zimmer products. The Agreement makes Nu Tech responsible for the "distribution and billing of Zimmer products," Nu Tech agreed to accept Zimmer products on consignment "for the purpose of stocking the shelves of referring physician's offices," and Nu Tech was to bill insurance carriers for Zimmer products consigned to it. Nu Tech's own program literature explaining the specifics of its "OfficeSoft" program refers to the program as the "OfficeSoft Soft Goods Consignment Program," see App. to Defendant. Resp. Brief, Exh. 10, 11, 17, & 22, and also as the "OfficeSoft DME Soft Goods Marketing Program." See Wendt Aff., Exh. C, Tab B.

The record provides no support for Nu Tech's argument that the OIG "conspicuously ignored" the issue of whether the compensation Nu Tech was to retain would constitute a supplier's legitimate net sales revenues. Nu Tech notes that the OIG did recognize that Nu Tech was to submit billings for Zimmer products by use of its Medicare supplier number, but Nu Tech points to no language in the Agreement that would have alerted the OIG to Nu Tech's suggested characterization of the compensation scheme.

B.

In addition to the opinion of the OIG, Zimmer cites to cases in which courts have struck down agreements containing percentage-based compensation schemes as illegal and unenforceable in violation of the federal anti-kickback statute. According to Zimmer, the percentage-based compensation scheme contained in its Agreement with Nu Tech closely parallels the compensation schemes struck down in the cited cases. Zimmer claims that those decisions "validate the OIG's opinion that marketing arrangements that involve percentage-based or other forms of compensation tied to the dollar value of sales and which do not meet a safe harbor violate the federal anti-kickback statute."

Under the marketing agreement in *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.,* 926 F.Supp. 835 (E.D.Ark.1996), *aff'd,* 112 F.3d 513, 1997 WL 232130 (8th Cir.1997), the plaintiff's compensation was based on the number of items the defendant sold to persons identified by plaintiff. "In other words, the more residents [the plaintiff] referred to [the defendant], the more money [the plaintiff] made under the Marketing

Agreement." 926 F.Supp. at 839. The court found that the agreement violated 42 U.S.C. 1320a–7(b)(1):

> [Plaintiff] was paid for referring persons who needed Medicare-covered supplies to [defendant], who in turn sold them those supplies (via their nursing homes), and this type of relationship falls squarely within the transactions prohibited by subparagraph A. Alternatively, [plaintiff] could be viewed as having been paid for recommending to Medicare recipients that they purchase their Medicare-reimbursable supplies from [defendant], and as such their relationship with [defendant] would violate subparagraph B. No matter how you slice it, the Marketing Agreement violates § 1320a–7(b)(1), and accordingly the subject matter of that agreement (a referral scheme for the provision of Medicare-covered supplies) is prohibited by that statute, as is the performance of that agreement.

926 F.Supp. at 843–844.

The management agreement in *Modern Medical Labs., Inc. v. Smith–Kline Beecham Clinical Labs., Inc.,* No. 92C5302, 1994 WL 449281 (N.D.Ill. Aug. 17, 1994), provided that the defendant would market, manage, and operate the plaintiff's laboratory business in return for 90% of the plaintiff's revenues. The court found that the agreement fit under a prohibited broker-style arrangement under which one entity receives remuneration for directing business to another entity. The plaintiff received orders for medical tests and arranged for the defendant to perform those tests. The court concluded that because the plaintiff was in a position to determine that one lab and not another would perform the medical tests it required, the plaintiff was receiving remuneration for referring work to that lab. "[the plaintiff's] revenue-sharing arrangement clearly seems to be the type of activity that Congress intended to criminalize, because such arrangements have the tendency to increase the prices charged to Medicare and Medicaid." *Id.* at *4.

Another percentage-based compensation agreement was at issue in *Medical Development Network, Inc. v. Professional Respiratory Care/Home Medical Equip. Servs., Inc.,* 673 So.2d 565 (Fla.Dist.Ct. App.1996). The agreement provided that the plaintiff would contact medical equipment users and promote and market the defendant's durable medical supplies to those users. In return, the plaintiff was to receive a percentage of the sales it generated for the defendant. The Florida court concluded that, based on comments issued by the Department of Health and Human Services in connection with its implementation of regulations governing the anti-kickback statute, arrangements involving independent contractors that are paid on a commission basis for business they generate violate the statute. *Id.* at 567.

Zimmer notes that pursuant to the parties' Agreement, Nu Tech would receive 20%–25% of Zimmer's yearly dollar volume of sales as its fee for marketing and billing services provided to Zimmer. Payments from Medicare and Medicaid programs would generate part of that dollar amount. Zimmer compares the compensation scheme of its Agreement to the cited cases' invalidated schemes in which the compensation would vary depending on degree of success in promoting or soliciting the purchase of products paid for by federal health care programs. Because Nu Tech would receive a fee for its role in the sale of Zimmer products to patients covered by federal and state health care programs, Zimmer argues that the Agreement falls within those activities prohibited by the anti-kickback statute.

Nu Tech disagrees with Zimmer's claim that payments under the Agreement's compensation scheme amount to remuneration in violation of the anti-kickback scheme. Nu Tech focuses on the parties' roles under the Agreement. According to Nu Tech, without knowing whether Zimmer or Nu Tech was to be the retailer of

goods under the Agreement, "it is impossible to determine whether Nu Tech was to receive legitimate proceeds of its own retail sales, or kickbacks for referring retail sales to Zimmer." Nu Tech claims that although a "[r]eview of the Agreement reveals that it does not contain substantial detail regarding the exact role to be played by Nu Tech," Nu Tech was to be the retailer of goods to patients under the Agreement. Nu Tech states that when the Agreement was signed, it was a Medicare supplier, having obtained a billing number from Medicare. Its intention was to operate as a supplier in its relationship with Zimmer.

As a Medicare supplier, Nu Tech could enter into an agreement to fill orders with inventory acquired from another company. 42 C.F.R. § 424.57(c)(1).[2] Nu Tech claims that because 42 C.F.R. § 424.57(c)(1) does not regulate the manner or extent to which the supplier may pay for the items, the Agreement constitutes a contract for the acquisition of inventory as expressly permitted under 42 C.F.R. § 424.57(c)(1). Nu Tech asserts that under the Agreement, Zimmer would have been the manufacturer and wholesaler of its goods to Nu Tech, and Nu Tech would have had to pay Zimmer for the goods Zimmer sold it. The moneys received by Nu Tech, then, "would simply [be] its net revenue arising from its own retail sales as a supplier." Nu Tech would pay Zimmer for the inventory, and what Nu Tech retained would be its net sales revenue.

Nu Tech maintains that the cases Zimmer cites are easily distinguishable and do not support the proposition that the proceeds of the sales to be retained by Nu Tech under the Agreement were kickbacks or remuneration for referring Medicare business. Nu Tech maintains that the compensation schemes in the cited cases differed from the compensation scheme found in its Agreement with Zimmer: the compensation in *Nursing Home Consultants* was on a per-item basis for referring business; payment in *Modern Medical Laboratories,* where no services were performed, was in exchange for direct referrals only; and no services were performed in *Medical Development Network* for which compensation might appropriately have been received. Nu Tech maintains that the compensation scheme in its Agreement with Zimmer differs because Nu Tech would not be receiving improper payments, but "would simply retain its net revenue arising from its own retail sales as a supplier."

Nu Tech also argues that because the statute prohibits conduct done "knowingly and willfully," more than mere payment or receipt of payment is necessary. Nu Tech points to interpretations of the anti-kickback statute that impose a *mens rea* requirement involving actual knowledge of the wrongfulness of the conduct involved. Nothing supports a conclusion, Nu Tech argues, that either party believed that their conduct under the Agreement would violate the anti-kickback statute, or that they entered into the Agreement with the specific intent to engage in prohibited conduct.

Nu Tech relies on interpretations by the Eighth and Ninth Circuits of the statutory intent requirement. *United States v. Jain,* 93 F.3d 436, 441 (8th Cir.1996) (intent requirement of the anti-kickback statute "should only require proof that [the offending party] knew his conduct was wrongful, rather than proof that he knew it violated 'a known legal duty.' "); *Hanlester Network v. Shalala,* 51 F.3d 1390, 1400 (9th Cir.1995) ("knowingly and willfully" requires a person "to (1) know that [the

---

**2.** 42 U.S.C. § 424.57(c)(1) provides:

 (c) Medicare does not issue a billing number to a supplier that submits claims for items ... until that supplier meets, and certifies that it meets, the following standards. The supplier—

 (1) In response to orders which it receives, fills those orders from its own inventory or inventory in other companies with which it has contracted to fill such orders ....

statute] prohibits offering or paying remuneration to induce referrals, and (2) engage in prohibited conduct with the specific intent to disobey the law."). Nu Tech concludes that "[n]either the Agreement on its face, nor any fact disclosed thus far by discovery, requires the conclusion that the parties intended anything other than Nu Tech's legal acquisition of inventory, on a consignment basis, under the Agreement."

Nu Tech notes that the OIG did not find that the Agreement would violate the statute, but found that a "definitive conclusion regarding the existence of an anti-kickback violation requires a determination of the parties' intent, which determination is beyond the scope of the advisory opinion process." According to Nu Tech, "the OIG's reference to intent as a critical factor in determining the legality of the Agreement highlights and supports Nu Tech's position that genuine disputed issues of material fact, including the question of intent, render summary judgment improper."

## V.

 Under Indiana law, contract interpretation involves a determination of the intent of the parties as expressed by the four corners of the contract. *Matter of Forum Group, Inc.*, 82 F.3d 159, 163 (7th Cir.1996); *Dvorak v. Christ*, 692 N.E.2d 920, 923 (Ind.Ct.App.1998). When written contract language is unambiguous, summary judgment is appropriate. *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir.1998). Whether a contract is ambiguous is a question of law for the court to decide. *Indiana Erectors v. Indiana Univ.*, 686 N.E.2d 878, 881 (Ind.Ct.App.1997). "The standard for determining contractual ambiguity is whether a reasonable person would find the contract subject to more than one interpretation. In applying this standard, courts will give a word or phrase its usual meaning unless the contract, when taken as a whole and considering its subject matter, makes clear that the par-

ties intended another meaning." *Trustees of First Union Real Estate v. Mandell*, 987 F.2d 1286, 1291 (7th Cir.1993) (citations omitted). A court will not make a new contract or add provisions not agreed upon by the parties. *Matter of Forum Group*, 82 F.3d at 163; *Dvorak v. Christ*, 692 N.E.2d at 924.

The Agreement's language overcomes Nu Tech's primary argument that it was the "supplier" under the Agreement:

2. Zimmer desires to engage [Nu Tech] in the distribution and billing of Zimmer products, but wishes to do so not as an employee but only as an independent contractor . . . .

3. The parties to this Agreement intend that the relationship between them created hereunder is that of a supplier and independent contractor.

While Nu Tech maintains that it was to be the "supplier" and Zimmer the "independent contractor" under paragraph 3, paragraph 2 actually establishes the roles of the parties. Paragraph 2 specifies that Zimmer desires to enter into an arrangement with Nu Tech; Zimmer does not want Nu Tech to be its employee; rather, Zimmer wants Nu Tech to act as an independent contractor. Pursuant to that arrangement, Zimmer would be the supplier and Nu Tech would be the independent contractor referred to in paragraph 3.

Nu Tech apparently possessed a Medicare billing number, which qualified it as a "supplier" under 42 C.F.R. § 424.57(a). Part of the service Nu Tech was offering Zimmer was Nu Tech's ability to submit claims to Medicare for payment. Even assuming that Zimmer had no Medicare billing number and did not contemplate obtaining one for purposes of its actions under the Agreement, *see* Wendt Aff., Exh. C, at 3 n. 3, the language of the Agreement remains. Medicare considered Nu Tech a "supplier," but Zimmer was the "supplier" under the Agreement.

The Agreement's "Course of Business" section provides the details of the arrangement:

> Zimmer agrees to consign a reasonable quantity of Zimmer softgoods products to [Nu Tech] for the purpose of stocking the shelves of the referring physician's offices based upon the physician's annual usage requirements. [Nu Tech] agrees to bill ... insurance carriers for the Zimmer product consigned to [Nu Tech] by Zimmer. [Nu Tech] agrees to forward the insurance carrier reimbursement and or patient payment, minus [Nu Tech's] fees ... for each reimbursement to Zimmer within thirty (30) days of receipt of the reimbursement form the insurance carrier and or patients.

The Agreement also provides, under the section entitled "Consignment Inventory," that Nu Tech was to "supply a recommended consignment level order for each new physician office to Zimmer based on the physician's office historic usage." As to replacement orders, Nu Tech was to "provide Zimmer with all replacement orders received from the referring physician's offices," and Zimmer was "to ship the Zimmer replacement product from the Zimmer location, to the account location address." All defective products or products shipped in error were to be returned directly to Zimmer. Upon the Agreement's termination, Nu Tech was required to return to Zimmer, within sixty days, "all consigned inventory in its possession," and "any remaining consigned inventory of Zimmer products being rented by customers at the time of termination shall be returned to Zimmer."

This language establishes an arrangement for the consignment of Zimmer products to Nu Tech. Zimmer would supply products to Nu Tech which, acting as an independent contractor, would distribute the products. When appropriate, Nu Tech would bill insurance carriers or individuals for the products. The Agreement's terms are not ambiguous, and nothing indicates that the parties intended a different meaning. Nu Tech's conclusion that the Agreement was one under which Nu Tech would purchase goods from Zimmer for resale by Nu Tech is not a reasonable interpretation of the Agreement.

The Agreement's Fee Schedule provides as follows:

> [Nu Tech] Agrees to forward all reimbursements from [Nu Tech's] contracted insurance carriers and patients who [Nu Tech] has billed for the sale of the Zimmer softgoods products, minus the following fee:

| Dollar Volume Receivable/Year | [Nu Tech's] Fee |
| --- | --- |
| $0 to $2 Million | 25% of Receivable |
| $2.1 Million to $4 Million | 22% of Receivable |
| $4.1 Million + | 20% of Receivable |

It is reasonable to conclude that Nu Tech was to provide billing services to Zimmer and to receive a fee for doing so. When a Zimmer product that had been consigned to Nu Tech and placed in a physician's office was received by the end-user, the Agreement would make Nu Tech responsible for submitting claims to insurance companies and/or the individual to recover for Zimmer the cost of the product. When payment was received from either the insurance company or the individual, Nu Tech would deduct its fee and forward the remainder of the payment to Zimmer. No reasonable interpretation of the Agreement could include a conclusion that Nu Tech's fee, as contemplated by the Agreement and set forth in Fee Schedule, constituted Nu Tech's cost of goods sold.

The anti-kickback statute makes it unlawful to knowingly and willfully "solicit or receive" any remuneration "in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good ... or item for which payment may be made in whole or in part under a federal health care program." 42 U.S.C. § 1320a–7b(b)(1)(B). It is also unlawful to knowingly and willfully "offer or pay" any remuneration "to any person to induce such person ... to purchase, lease, order, or arrange for or recommend pur-

chasing, leasing, or ordering any good ... or item for which payment may be made in whole or in part under a federal health care program." 42 U.S.C. § 1320a–7b(b)(2)(B). The OIG explained that, "[t]his provision is extremely broad. The types of remuneration covered specifically include kickbacks, bribes, and rebates .... In addition, prohibited conduct includes not only remuneration intended to induce referrals of patients, but remuneration also intended to induce the purchasing, leasing, ordering, or arranging for any good, facility, service, or item paid for by Medicare or State health care programs." General Comments, Office of Inspector General, Notice of Final Rule, Anti–Kickback Provisions of Medicare and State Health Care Programs, 55 Fed.Reg. 35,952 (1991).

■ Based on the statute's broad scope and the Agreement's clear language, the court agrees with the OIG's conclusion in Advisory Opinion 98–1 that the parties' Agreement might involve prohibited remuneration under the statute. Under the terms of the Agreement, it would be reasonable to conclude that Nu Tech was to receive remuneration from Zimmer in return for "arranging for" or "recommending purchasing or ordering" Zimmer's products, products that might be paid for in full or in part by federal or state health care programs. It would also be reasonable to conclude that under the terms of the Agreement, Zimmer was to pay remuneration to Nu Tech "to induce" Nu Tech to "arrange for or recommend purchasing or ordering" Zimmer's products—products that might be paid for in full or in part by federal or state health care programs.

Nu Tech maintains that no one can say whether the Agreement violates the anti-kickback statute without knowing the parties' true intent of the parties. The court is unpersuaded. The statute requires that the prohibited acts (soliciting, receiving, offering, or paying) be done "knowingly and willfully," not that the actor "knowingly and willfully" intend to violate the statute. Comments by the OIG in its Notice of Final Rule provide guidance regarding use of the phrase "knowingly and willfully" in the statute:

> The statute requires proof of a knowing and willful intent to induce or arrange for referrals or for other business reimbursable under the Medicare or Medicaid programs.... Thus, the extent to which conduct is motivated by inducing or arranging for referrals will, in large part, determine liability under the statute.

Office of Inspector General, Notice of Final Rule, Anti–Kickback Provisions of Medicare and State Health Care Programs, 55 Fed.Reg. 35,952, 35,959 (1991). *See also United States v. Neufeld,* 908 F.Supp. 491, 496 (S.D.Ohio 1995) ("a concern for prosecuting those acting inadvertently, however, does not equate 'willfulness' with knowledge of illegality"); *Medical Dev. Network, Inc. v. Professional Respiratory Care/Home Medical Equip. Servs.,* 673 So.2d 565, 567 (Fla. Dist.Ct.App.1996) (holding that the anti-kickback statute "is directed at punishment of those who perform specific acts and does not require that one engage in the prohibited conduct with the specific intent to violate the statute").

Inclusion of the percentage-based compensation scheme appears to be sufficient to justify the conclusion that the parties' actions under the Agreement could be motivated by their desire and ability to increase sales of Zimmer products that might be paid for by federal or state health care programs.[3] Regardless of which party was to be responsible for the marketing of the Zimmer products, the

---

3. In fact, the Safe Harbor Regulations specifically exclude from their protection any arrangement where compensation is "determined in a manner that takes into account the volume or value of any referrals or business otherwise generated by the parties for which payment may be made in whole or in part under Medicare or a state health care program." 42 C.F.R. § 1001.952(d)(5).

end result would be the same: the more products sold, the more money the parties would make. "The gravamen of Medicare Fraud is inducement. Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient." *United States v. Bay State Ambulance*, 874 F.2d 20, 29 (1st Cir.1989). The court finds convincing the OIG's conclusion that the Agreement "provides multiple opportunities and financial incentives for marketing and billing activities that may lead, individually or collectively, to more than a minimal risk of Federal health care program abuse." Advisory Opinion 98–1, at 8.

Performance under this Agreement is the type of conduct that the anti-kickback statute was enacted to prevent and the type of conduct that might result in the parties being subject to prosecution and/or penalties. Zimmer is not required to prove that a prosecution would result from performance under the Agreement, or that the government would be able to obtain a conviction. It is enough to say that in light of this ruling, any future performance under the Agreement would appear likely to amount to knowing and willful action. The plaintiff is entitled to summary judgment: the Agreement is illegal and unenforceable because it involves an arrangement prohibited by 42 U.S.C. § 1320a–7b(b).

Because the court has concluded that the Agreement violates 42 U.S.C. § 1320a–7b(b)(1), a decision as to whether the Agreement may violate 42 U.S.C. § 1320a–7(b)(6) is unnecessary.

■■■■ Generally, contracts made in violation of a statute are void. *Continental Basketball Assoc., Inc. v. Ellenstein Enterprises, Inc.*, 669 N.E.2d 134, 139 (Ind.1996). There is a strong presumption of enforceability where a contract represents the parties' intention freely bargained for, but such a contract may be unenforceable on public policy grounds if the contract (a) contravenes a statute, (b)

clearly tends to injure the public in some way, or (c) is otherwise contrary to declared public policy of Indiana. *Id.* Courts will not make a new contract or add provisions not agreed to by the parties, *Dvorak v. Christ*, 692 N.E.2d 920, 924 (Ind.Ct.App. 1998), but if an illegal provision can be eliminated without frustrating the contract's basic purpose, the rest of the contract may be enforced. *Corner v. Mills*, 650 N.E.2d 712, 715 (Ind.Ct.App.1995).

Nu Tech claims that the parties intended that any invalid portion(s) would be severed without affecting the enforceability of the remaining provisions of the Agreement. *See* Agreement, at 4. Nu Tech maintains that the Agreement could be completely implemented with respect to non-Medicare and non-government funded insurance programs, so summary judgment should be denied as it relates to sales to those persons not covered by government health care programs.

■■■■ The Agreement, which violates the federal anti-kickback statute, 42 U.S.C. § 1320a–7b(b), is void and unenforceable under Indiana law. *See Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F.Supp. 835, 842 (E.D.Ark.1996) ("If the Marketing Agreement violates the law and/or policy underlying the federal Medicare system, as expressed in the Medicare statutes and regulations, it is illegal in any state in the Union."). The court does not believe that severability of Medicare and other government health care programs from the Agreement is practicable. Any attempt to limit the parties' dealings to only those sales that would not involve any state or federal government funded insurance payments would amount to a restructuring and general redrafting of the Agreement, and the law does not allow the court to rewrite a contract for the parties.

VI.

Based on the foregoing, the court concludes that the parties' Agreement violates

42 U.S.C. § 1320a–7b(b), and the Agreement is therefore illegal and unenforceable. For these reasons, the court granted Zimmer's summary judgment motion in today's separate order. The clerk shall enter judgment for the plaintiff's to the effect that the Agreement in this case is void and unenforceable.

SO ORDERED.